IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

L.O.K., by and through ELAINE
KELSEY,

              Plaintiff,

    v.

GREATER ALBANY PUBLIC
SCHOOL DISTRICT 8J; MARK
GULLICKSON; JERRIE MATUSZAK,

              Defendants.

Civ. No. 6:20-cv-00529-AA

**ORDER**

_____

AIKEN, District Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment. ECF No. 28. The Court concludes that this matter is appropriate for resolution without oral argument. For the reasons set forth below, the motion is GRANTED in part and DENIED in part. The Court GRANTS Plaintiff's Motion to Unseal a Document, ECF No. 41.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## II.    Qualified Immunity

Defendants have raised the defense of qualified immunity.  A defendant is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation and (2) whether

the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne,* 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009).

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks and citation omitted, emphasis in original).

Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003). The official is still entitled to qualified immunity if the official "could have believed, 'reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right.'" *Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a

mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).

## BACKGROUND

Plaintiff L.O.K. is a twelve-year-old child who is intersex and non-binary. L.O.K. Decl. ¶ 1. ECF No. 34. Plaintiff uses they/them pronouns. L.O.K. Decl. ¶ 1. Plaintiff was a student at Oak Grove Elementary School ("Oak Grove") beginning in 2015, which was their second-grade year. Ans. ¶ 8, ECF No. 8; L.O.K. Decl. ¶ 2. Plaintiff's guardian and next friend is their mother, Elaine Kelsey. Kelsey Decl. ¶ 1. ECF No. 35.

Defendant Greater Albany Public School District 8J (the "District") is a public school district in Albany, Oregon. Ans. ¶ 5. The District receives state and federal funding and operates schools, including Oak Grove. *Id.*

Defendant Jerrie Matuszak was the principal of Oak Grove during the relevant period. Ans. ¶ 6.

Defendant Mark Gullickson was Plaintiff's teacher in third grade. L.O.K. Decl. ¶ 3. In addition to teaching, Gullickson was the volunteer coach of the LEGO robotics team at Oak Grove. Vickers Decl. Ex. 3, at 2. ECF No. 29.

Plaintiff first identified as genderfluid while in third grade, but later began to identify as nonbinary. L.O.K. Decl. ¶ 4. Plaintiff did not initially use they/them pronouns, but "did gradually start coming out as genderfluid" in the spring of 2017. *Id.* at ¶ 5. Plaintiff wrote that they "wanted to be a boy in an assignment for Mr. Gullickson," as a way of "letting him know that I am genderfluid and testing the

waters." *Id.*; L.O.K. Decl. Ex. 1.  Plaintiff did not directly discuss being genderfluid or nonbinary with any adult other than their mother during their third grade year. Vickers Decl. Ex. 2, at 4.  Kelsey told Gullickson directly that Plaintiff was genderfluid during a parent-teacher conference in the spring of 2017.  Kelsey Decl. ¶ 11.  Midway through the school year, Plaintiff stopped wearing dresses and skirts and began to wear clothes from the boys' section of the store.  Kelsey Decl. ¶ 6.  At his deposition, Gullickson testified that he was not aware of Plaintiff being genderfluid or nonbinary, or that they used they/them pronouns until he was served with the Complaint in this case.  Vickers Decl. Ex. 3, at 3-4.

After writing in the assignment that they wanted to be a boy, Plaintiff perceived that Gullickson became distant, dismissive, and "started treating me like I was stupid." L.O.K. Decl. ¶ 6.  Plaintiff was assigned a "helper" and made to sit in a desk next to Gullickson's desk.  *Id.* at ¶ 6.  Plaintiff "got in trouble for things that other kids did not get in trouble for." *Id.* at ¶ 6.  Gullickson emailed Kelsey to report behavioral issues with Plaintiff while they were in his class.  Kelsey Decl. ¶¶ 7-8.  Kelsey told Gullickson that Plaintiff's issues might be related to their stepparent's issues with mental illness and that Plaintiff was seeing a counselor.  Vickers Decl. Ex. 1, at 30-33.  Gullickson also told Kelsey that Plaintiff was "was doing badly in both math and reading," but Kelsey felt that Plaintiff "had never struggled in either math or reading and their grades did not reflect any deficiency in performance." Kelsey Decl. ¶ 9.

Plaintiff also began to experience hostility from their classmates, including the use of slurs and other abusive language related to Plaintiff's gender expression. L.O.K. Decl. ¶ 7.  Plaintiff was bullied "on the bus, cafeteria, and on the playground," and the supervising adults did not intervene.  *Id.* at ¶ 8.  Plaintiff and some of their classmates discussed the possibility of going on strike and would "stop going to class to make a statement that what was happening was wrong."  *Id.*  Matuszak learned of the planned protest and called Plaintiff and their friends to the school office and told them that their behavior was unacceptable.  *Id.*  The bullying continued.  *Id.*

Plaintiff was interested in joining the school robotics team and both Plaintiff and Kelsey expressed this interest to Gullickson in the spring of 2017.  L.O.K. Decl. ¶¶ 9-10.  During a parent-teacher conference, Kelsey raised the issue of the robotics team with Gullickson and was told "that kids sign up at the end of the year and that he would contact us in the fall when the team was starting."  Kelsey Decl. ¶ 11. Gullickson did not give Kelsey any paperwork, nor did he mention an application to join the team.  *Id.*  Gullickson told Plaintiff that he would be in touch with them in the fall but did not tell them about a parent information packet or filling out an application to join the team. L.O.K. Decl. ¶ 10.  One of Plaintiff's friends was invited to join the robotics team over the summer, but Gullickson did not contact Plaintiff. *Id.* at ¶ 12.  Plaintiff did not fill out an application to join the robotics team.  Vickers Decl. Ex. 2, at 6-7.  Plaintiff was not aware of any students who requested an application and had their request denied. Second Vickers Decl. Ex. 2, at 3.  ECF No. 40. The robotics team was announced as part of school assemblies.  *Id.* at 2.  In the

fall of 2017, Plaintiff learned that that the season had begun without their being offered an opportunity to join the team.  L.O.K. Decl. ¶ 12.

When Kelsey contacted Gullickson to ask about the robotics team in the fall of 2017, Gullickson told Kelsey that Plaintiff "was supposed to have contacted him at the beginning of the school year to apply."  Kelsey Decl. ¶ 13.  Kelsey maintains that this was not what Gullickson told her at the parent teacher conference in the spring of 2017.  *Id.*  Kelsey forwarded her correspondence with Gullickson to Matuszak and raised her belief that Gullickson was excluding Plaintiff from the team.  *Id.* at ¶ 15. Matuszak spoke with Gullickson and told Kelsey that Plaintiff "could not be on the girls' team because they did not fill out the application or show enough initiative." *Id.* at ¶ 16.  Kelsey did not make any complaint about Gullickson during Plaintiff's third grade year.  Second Vickers Decl. Ex. 1, at 2.

Another parent showed Kelsey a screenshot of a social media conversation in which parents of students on Gullickson's robotics team discussed why they did not want Plaintiff to join the team due to "the preference of team members and their parents for a strongly feminine aesthetic."  Kelsey Decl. ¶ 17.  During the 2017-2018 school year, the Oak Grove girls' robotics team wore pink t-shirts, bows, and tutu skirts while competing.  Second Vickers Decl. Ex. 3, at 14-17.  Kelsey reported the issue to Matuszak.  Kelsey Decl. ¶ 17.   In his deposition, Gullickson testified that he did not consult with the parents of members of the robotics team about applications to join the team unless the parent was registered as a co-coach.  Second Vickers Decl. Ex. 3, at 4.

Kelsey ultimately started her own robotics team so that Plaintiff could participate. Kelsey Decl. ¶ 14. Kelsey reached out to Gullickson for advice about coaching, but Gullickson declined to meet with Kelsey, telling her that he was no longer coaching. *Id.* Kelsey later learned that Gullickson continued to coach the school robotics team. *Id.*

Gullickson did not contact Plaintiff about the robotics team prior to Plaintiff's fifth grade year, 2018-2019, although Plaintiff saw Gullickson invite another student to join the robotics team while Plaintiff was standing nearby. L.O.K. Decl. ¶¶ 13, 20. Plaintiff did not apply to join the robotics team during their fifth grade year. Vickers Decl. Ex. 2, at 15. Plaintiff continued to participate in their mother's robotics team because Kelsey did not want Plaintiff to interact directly with Gullickson. *Id.*

Beginning in the fourth grade, in 2017-2018, Plaintiff resolved to begin using they/them pronouns, but "didn't tell anyone at first." L.O.K. Decl. ¶ 11. Plaintiff continued to experience hostility from some of their peers as a result of their gender expression. *Id.* at ¶ 14. "The class was divided: You were either against gay people or you were going to get bullied." *Id.* Plaintiff confided these issues to their mother and Kelsey reported them to Matuszak. Kelsey Decl. ¶ 19.

Towards the end of Plaintiff's fourth grade year, their class took a field trip to study the Oregon Trail and students were encouraged to dress like pioneers. L.O.K. Decl. ¶ 15. Plaintiff wanted to wear pants and suspenders on the field trip but their teacher "said that I was a lady, so I had to be the mother of the household, which meant wearing a dress." *Id.* Kelsey spoke with Plaintiff's teachers about the issue

and was told they "did not want [Plaintiff] to dress like a boy because the local newspaper would be taking pictures of the kids." Kelsey Decl. ¶ 22. Plaintiff was ultimately allowed to wear pants and suspenders after their mother spoke with Plaintiff's teachers "[b]ut the experience made me feel again like I could not trust teachers and adults at Oak Grove to respect my gender identity." L.O.K. Decl. ¶ 16. Kelsey reported the issue to Matuszak. Kelsey Decl. ¶ 23.

Between fourth and fifth grade, Plaintiff told their mother that they wanted to begin using they/them pronouns, but they "decided that it would not be safe" to use gender neutral pronouns at school. L.O.K. Decl. ¶¶ 17-18.

In 2018, the Oregon Department of Education instituted a policy change allowing students to register as non-binary in the 2018-2019 school year. Mitchell Decl. Ex. 3. ECF No. 37. During the summer of 2018, Kelsey registered Plaintiff for fifth grade at Oak Grove and found that there was no option for registering them as non-binary and that Plaintiff was already listed as female. Kelsey Decl. ¶ 24. When Kelsey contacted Matuszak to ask about non-binary registration, she was told the system was not in place yet. *Id.* at ¶ 25. Kelsey affirms that the following exchange occurred:

> Then [Matuszak] looked at me and asked: "But do you really want to do this?" I asked her what she meant. She shrugged and said, "Well you know, you're [Plaintiff's] parent, it's your job to keep her safe." I asked her why changing [Plaintiff's] gender on the form would not be safe. She didn't really answer, just shrugged again.

Kelsey Decl. ¶ 25.

Kelsey also asked Matuszak about Plaintiff's use of they/them pronouns and was told "some teachers would be fine with it, but other teachers might not be due to religious beliefs." Kelsey Decl. ¶ 26. Matuszak was equivocal on whether it would be safe for Plaintiff to use gender neutral pronouns. *Id.*

Plaintiff believes that they told their fifth grade teachers that they were genderfluid at the beginning of the year. L.O.K. Decl. ¶ 18. Plaintiff spoke to their fifth grade teachers about their preferred pronouns and asked their teachers to use they/them pronouns in private, but not in class because Plaintiff was concerned about how their classmates would react. Vickers Decl. Ex. 2, at 12. Plaintiff continued to use she/her pronouns while in class. *Id.*; Ex. 5, at 3. Plaintiff felt that their teachers responded appropriately to the request. Vickers. Decl. Ex. 2, at 12. Plaintiff's teachers told Kelsey "that they would not be able to protect [Plaintiff] from bullying that took place outside of their classroom," and Matuszak told Kelsey that Plaintiff "would not be protected on the playground, on the bus, in the halls, and in the cafeteria." Kelsey Decl. ¶ 28; Riley Decl. ¶ 9. ECF No. 36.

Plaintiff asserts that, while Plaintiff was in the fifth grade, Gullickson "started acting strangely" towards them while Plaintiff waited for the school bus. L.O.K. Decl. ¶ 20. Gullickson would stand "uncomfortably close to me, within half an arm's length, and stare at me in a hostile way, not saying anything," while at other times he would ignore Plaintiff entirely. *Id.* Plaintiff found the experience intimidating, stressful, and frightening. *Id.* Plaintiff reported Gullickson's behavior to their mother, who reported the matter to Matuszak, but Plaintiff affirms that Gullickson's behavior

continued unchanged.  L.O.K. Decl. ¶ 21; Kelsey Decl. ¶ 29.  Matuszak testified in

her deposition that she told Gullickson that if he was engaging in the reported

behavior, he should stop and that he should be aware of his conduct in Plaintiff's

presence.  Vickers Decl. Ex. 4, at 3.  Gullickson denied that he had glared or stared

at Plaintiff.  *Id.*  During a PTA meeting in September 2018, Kelsey told Matuszak

that Gullickson "was continuing to approach [Plaintiff]."   Kelsey Decl. ¶ 30.

Matuszak was apologetic and told Kelsey "Gullickson was not listening to her and

that she wasn't sure what else she could do about it."  *Id.*

Plaintiff describes their fifth grade experience as "a really rough time."  L.O.K.

Decl. ¶ 20.

> The bullying got worse in fifth grade.  Kids constantly told me that I and
> other LGBTQ people were disgusting and gross.  They said other really
> mean, hurtful things to me: for example, they told me that by being
> myself I was hurting other people, that God hated me, that I was going
> to hell, that I was the devil's spawn, and that they were going to turn all
> the other kids against me and teach them to hate LGBTQ people too.
> They told me I was menace to society and a hinderance for being the way
> I was.  They constantly dismissed me and told me my opinion wasn't
> valid about a math or science question because I was queer.  They didn't
> say "LGBTQ" but used words like "faggot."  They also did things like cut
> me on the lunch lines.  I played trumpet in orchestra, and they opened
> the clasps on the instrument case so that my instrument would fall on
> the floor.  They told me that they did these things to me because I'm
> queer . . . I regularly found religious pamphlets in my backpack.  I don't
> know who put them there.  I tried to throw them out without looking at
> them.

L.O.K. Decl. ¶¶ 22, 24.

Plaintiff did not report these incidents directly to the school authorities.

Second Vickers Decl. Ex. 2, at 4-7.  Plaintiff told their mother about the bullying and

Kelsey spoke with Matuzak and Plaintiff's teachers, but Plaintiff observed that

"nothing changed." L.O.K. Decl. ¶ 25; Kelsey Decl. ¶ 31. Kelsey reported incidents

of bullying to Plaintiff's teacher, Beth Riley, who took the reports "very seriously,"

and forwarded them to Matuszak. Riley Decl. ¶¶ 10-12. Riley believed it was

Matuszak's "responsibility to investigate and respond to [Kelsey's] reports because

the bullying was taking place outside my classroom, and involved not only children,

but also parents." Riley Decl. ¶ 12. Matuszak did not speak to Plaintiff about the

bullying and harassment they were experiencing. L.O.K. Decl. ¶ 25.

Plaintiff "started to feel really, really bad," and "felt disconnected from my

environment—liked if I *didn't* disconnect from everything around me, I would hurt

myself." L.O.K. Decl. ¶ 26. Kelsey also received a hostile anonymous email from the

parents of one of Plaintiff's classmates. Kelsey Decl. ¶ 32.

Plaintiff reported to their mother that "another student threatened to remove

their clothing to inspect their genitals, to see if they were a boy or girl." Kelsey Decl.

¶ 37. Kelsey told Matuszak immediately but was told "'what do you expect us to do,'

and 'we can't intervene unless there is actually violence, not just threats.'" *Id.* Kelsey

concluded that making reports to Matuszak was not improving conditions at Oak

Grove the "situation could escalate and that [Plaintiff] was in physical danger." *Id.*

at ¶ 38.

Beginning in November 2018, Plaintiff transferred from Oak Grove to Albany

Online. L.O.K. Decl. ¶ 26. Kelsey hoped that the transfer to Albany Online would be

temporary while the District addressed the situation at Oak Grove. Kelsey Decl. ¶

39. Kelsey reported the situation at Oak Grove to District administrators, but they

"*did not connect me with anyone who could help.*" *Id.* at ¶ 40. Kelsey also asked about counseling for Plaintiff and was told that counseling could not be provided. *Id.*

Plaintiff struggled with online classes, especially after one of their teachers did not respond to Plaintiff's email disclosing that they were nonbinary and preferred to use they/them pronouns. L.O.K. Decl. ¶ 28. The teacher later told Kelsey that she believed Plaintiff's email was private and that the teacher had not received training on working with nonbinary children. Kelsey Decl. ¶ 43. Albany Online administrators declined to provide training for Plaintiff's teacher. *Id.* at ¶ 44.

Plaintiff continued to attend Oak Grove for extracurricular activities, including orchestra practice. L.O.K. Decl. ¶ 29. Plaintiff observed that Gullickson would circle the orchestra room looking into the windows and when Gullickson entered the room he would speak to and compliment other students while ignoring Plaintiff. *Id.* On other occasions, he would stare at Plaintiff "*in a hostile way, saying nothing.*" *Id.* Plaintiff affirms that this happened multiple times per week and that it left Plaintiff feeling frightened and intimidated. *Id.*[1] Kelsey reported the issue to the Albany Online administrators. Kelsey Decl. ¶ 46. Matuszak investigated the report and found that Gullickson had gone to the orchestra room to speak with the school behavioral specialist who was in the room. Vickers Decl. Ex. 4, at 7-8.

Plaintiff began to feel disconnected and unable to focus and "*started thinking about hurting myself again.*" L.O.K. Decl. ¶¶ 29-30. Plaintiff "*was unable to study without adult supervision and again expressed hopelessness and suicidal thoughts.*"

---

[1] Plaintiff's mother asserts that Gullickson directed a vulgar gesture towards Plaintiff while in the orchestra room. Kesley Decl. ¶ 46. No such claim appears in Plaintiff's own first-hand account of the episode. L.O.K. Decl. ¶ 29.

Kelsey Decl. ¶ 47.  Plaintiff "stopped logging into the [Albany Online] system and would not complete assignments." *Id.* Kelsey hired a tutor for Plaintiff, but the tutor quit after Plaintiff began joking about committing suicide. *Id.* at ¶ 48.  Kelsey attempted to secure mental health services for Plaintiff. *Id.* The District sought a referral for a counselor for Plaintiff and was able to secure a paid referral to a counselor from the county mental health service.  Second Vickers Decl. Ex. 7, at 2.

Plaintiff did not have an assigned Albany Online teacher for approximately three months.  Kelsey Decl. ¶ 51.  When Plaintiff took an in-person standardized test, an Albany Online test facilitator misgendered Plaintiff.  L.O.K. Decl. ¶ 31.  When Kelsey complained about the interaction, Albany Online administrators told her that "if [Plaintiff] wanted teachers to use gender-neutral pronouns they should change their name to something that 'sounded less like a girl's name.'"  Kelsey Decl. ¶ 51. Kelsey was also told "This is Linn County.  You can't expect people to be accepting of a non-binary person here." *Id.*  In March, the Albany Online administrators suggested that Kelsey transfer Plaintiff out of the District. *Id.* at ¶ 54.  The administrators also threated to involve truancy officers because Plaintiff was not participating in the online school. *Id.*

In March 2019, Kelsey attempted to make a Title IX complaint, but when she called the number listed on the District's website, she was told that she needed to speak the superintendent.  Kelsey Decl. ¶ 52.  When Kelsey attempted to contact the superintendent, she was told that he could not assist her because he was only the interim superintendent and that Kelsey's complaint was outside of the scope of

authority for the assistant superintendent. *Id.* Kelsey's messages were not returned and the District did not tell Kelsey that there was a Title IX coordinator for the District or that the Title IX coordinator was the person would could address Kelsey's complaint. *Id.* at ¶¶ 52-53.

Near the end of Plaintiff's fifth grade year, Plaintiff transferred to Mountain View Elementary School in the nearby Corvallis School District on an emergency basis. L.O.K. Decl. ¶ 32; Kelsey Decl. ¶ 55. At their new school, Plaintiff was able to use they/them pronouns and they have not experienced the sort of bullying and harassment in Corvallis that they experienced while they were a student of the District. L.O.K. Decl. ¶ 32. Plaintiff's emergency transfer to the Corvallis School District did not guarantee Plaintiff a place in the new school district indefinitely and Plaintiff was not eligible to take a school bus. Kelsey Decl. ¶ 56. The school's distance from Plaintiff's home imposed additional hardships on Plaintiff's mother, who had to drive Plaintiff to school each day. *Id.*

Kelsey filed a grievance with the District school board in October 2019 but she did not receive a response to the grievance. Kelsey Decl. ¶ 56.

## DISCUSSION

Plaintiff brings claims for (1) violation of their Fourteenth Amendment equal protection rights pursuant to 42 U.S.C. § 1983 against all Defendants; (2) violation of Title IX, 20 U.S.C. §1681(a), alleging discrimination by the District; (3) violation of Title IX, alleging retaliation by the District; (4) discrimination on the basis of sex and sexual orientation pursuant to ORS 659.850 against the District; and (5) retaliation

for reporting a violation of state or federal law pursuant to ORS 659.852 against the District. First Am. Compl. ("FAC") ¶¶ 43-70.

As a preliminary matter, Plaintiff concedes to the dismissal of their claims for retaliation under Title IX and for retaliation under ORS 659.852. Pl. Resp. 29 n.11. Plaintiff also concedes that they cannot recover punitive damages for their claim under ORS 659.850. *Id.* at 32. The Court accepts Plaintiff's concessions and those claims are DISMISSED.

With respect to the remaining claims, Defendants move for summary judgment on the basis that (1) Plaintiff's claims are untimely; (2) the evidence does not support a claim for violation of Plaintiff's equal protection rights as to any Defendant; (3) Defendants Gullickson and Matuszak are entitled to qualified immunity; (4) the evidence does not support a claim for violation of Title IX against the District; and (5) that the evidence does not support a claim for discrimination under ORS 659.850.

## I.    Timeliness

Defendants assert that each of Plaintiff's claims is time-barred. For claims under § 1983 and Title IX, federal courts borrow the state statute of limitations for personal injury actions. *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006). "In Oregon, the statute of limitations for personal injury claims is two years," borrowing the statute of limitations from ORS 12.110(1). *Samuelson v. Or. State Univ.*, 162 F. Supp.3d 1123, 1134 (D. Or. 2016). Because Plaintiff commenced this action on March 31, 2020, Defendants contend that any portion of Plaintiff's

claims that based on events taking place before March 31, 2018 fall outside of the limitations period.

However, when a federal court "applies or borrows a state statute of limitations, it is also required to apply the state's equitable exceptions, to the extent these are consistent with federal law." *Emrich v. Tocuhe Ross & Co.*, 846 F.2d 1190, 1199 (9th Cir. 1988). This includes tolling the limitations period for plaintiffs who are minors. *Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 580 (9th Cir. 2012). In Oregon, the limitation period for claims brought by minors under ORS 12.110 may be extended for up to five years or for one year after the plaintiff attains the age of 18, "whichever comes first." ORS 12.160(1), (2).

Because Plaintiff is still below the age of 18, they have a maximum of seven years after the claim accrues in which to bring their claims under § 1983 and Title IX. *See Christiansen v. Providence Health Sys. of Ore. Corp.*, 344 Or. 445, 451-52 (2008) ("ORS 12.160 extends that two-year period for an additional five years during the child's minority."). That expanded limitations period easily encompasses the entire relevant period in this case. The Court therefore concludes that Plaintiff's federal claims are timely.

Because the District is a public entity, Plaintiff's claim under ORS 659.850 is subject to the limitations of the Oregon Tort Claims Act ("OTCA"). ORS 30.265(2). Among other limitations, the OTCA provides that plaintiffs must give notice of their claim. ORS 30.275(1). The time for giving OTCA notice is ordinarily 180 days after the alleged loss or injury, which is tolled for an additional 90 days in cases of minority

for a total of 270 days.  ORS 30.275(2).  The ordinary tolling period for claims brought by minors does not apply to claims brought under ORS 659.850.  ORS 12.160(1) (limiting minority tolling to actions "mentioned in ORS 12.010 to 12.050, 12.070 to 12.250 or 12.276."); *see also Catt v. Dep't of Human Servs.*, 251 Or. App. 488, 499-500 (2012) (holding "under ORS 30.275(2), minors are required to give notice of a tort claim to a public body and its employees within 270 days of the discovery of their alleged injuries, and ORS 12.160 does not toll this notice period.").

In this case, Plaintiff sent their OTCA notice to the District on September 30, 2019.  FAC ¶ 42.  As such, their claim would ordinarily be limited to events occurring up to 270 days before that date, or January 3, 2019.  However, Plaintiff asserts that their claim is timely under a continuing violation theory.

"The continuing tort doctrine applies to repeated instances or continuing acts of the same nature where there is no discrete act or incident that can be fairly determined to have caused the alleged harm." *Person v. Reynold Sch. Dist. No. 7*, 998 F. Supp.2d 1004, 1027 (D. Or. 2014); *see also Menchu v. Multnomah Cnty. Health Dept.*, Case No. 3:20-cv-00559-AC, 2021 WL 2450780, at *5 (D. Or. May 3, 2021) ("The continuing-violations doctrine extends the accrual of a claim if a *continuing system of discrimination* violates an individual's right up to a point in time that falls within the applicable limitations period." (internal quotation marks and citation omitted, emphasis in original)).  The continuing tort doctrine "applies when there is no single incident that can fairly or realistically be identified as the cause of significant harm." *Menchu*, 2021 WL 2450780, at *5 (internal quotation marks and citation omitted).

In Oregon, courts distinguish "between a continuing course of conduct that involves discrete acts, each of which would be actionable separately, and a series of acts constituting a 'continuing tort.'" *Pearson*, 998 F. Supp.2d at 1027. To be considered a "continuing tort," the complained-of acts "although separate incidents, are not the type of discrete permanent events that would likely support separate actions for wrongful discrimination," but instead "can be reasonably construed as elements of a systemic pattern of conduct" aimed at causing the plaintiff harm. *Griffin v. Tri-Met*, 112 Or. App. 575, 581-82 (1992), *aff'd in part and rev'd in part on other grounds*, 318 Or. 500 (1994). A continuing tort may render timely claims that would otherwise be barred by the OTCA notice provisions and statute of limitations. *Pearson*, 998 F. Supp.2d at 1028.

Here, Plaintiff alleges that the acts of the District described in the previous section caused Plaintiff to be denied access to an education; to be excluded from regular school activities; to suffer emotional harm; and ultimately obliged Plaintiff to transfer to another school district. FAC ¶ 61. Plaintiff alleges specific incidents, including incidents occurring within 270 days of the filing of the OTCA notice, that, while not necessarily individually actionable under ORS 659.850, can be reasonably construed as a systemic pattern of conduct aimed at causing Plaintiff to seek an education outside of the District. On this record, the Court declines to dismiss Plaintiff's claim under ORS 659.850 as time-barred.

## II.    Equal Protection

Plaintiff brings a claim for violation of their Fourteenth Amendment right to equal protection against Gullickson, Matuszak, and the District itself.  Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (internal quotation marks and citation omitted).  To make out an equal protection claim under §1983, a plaintiff must plead and prove that the defendants discriminated against them as a member of a protected or identifiable class and that the discrimination was intentional.  *See Flores v. Morgan Hill Unified Sch. Dis.*, 324 F.3d 1130, 1134-35 (9th Cir. 2003).    Discrimination on the basis of gender presentation is subject to heightened scrutiny under the equal protection clause.  *See Norsworthy v. Beard*, 87 F. Supp.3d 1104, 1119 (N.D. Cal. 2015) (holding that "discrimination based on transgender status independently qualifies as a suspect classification under the Equal Protection Clause," because a person "is defined as

transgender precisely because of the perception that his or her behavior transgresses gender stereotypes," and "[t]here is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." (internal quotation marks omitted, citing *Swenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000))). In this case, Defendants maintain that no intentional discrimination occurred and that the individual Defendants are entitled to the benefit of qualified immunity. Defendants do not argue that the alleged acts were justified under any particular level of scrutiny. The Court will therefore address each Defendant in turn.

### A. Gullickson

In the case of Gullickson, Defendants contend that there is no evidence of Gullickson treating Plaintiff differently from similarly situated classmates who conformed to traditional gender presentation.

As a preliminary matter, Gullickson affirms that he was unaware that Plaintiff identified as genderfluid or non-binary until he was served with the complaint in this case. As discussed above, Plaintiff has presented evidence that they wrote about wanting to be a boy in a school assignment as a way of "testing the waters" with Gullickson and Kelsey asserts that she told Gullickson that Plaintiff was genderfluid during a parent-teacher conference. What Gullickson knew about Plaintiff's gender expression and when he knew it are disputed issues of fact so the Court cannot grant summary judgment based on Gullickson's claimed lack of knowledge. For purposes

of this motion, the Court will assume that Gullickson was aware that Plaintiff was genderfluid or non-binary.

The other alleged incidents of disparate treatment by Gullickson concern his report of minor in-class behavioral issues from Plaintiff and the corrective actions Gullickson took in response to those issues, as well as his report that Plaintiff was having difficulties in math and reading. In addition, Plaintiff relies on Gullickson's alleged exclusion of them from the robotics team.

With respect to Gullickson's report of behavioral problems, Plaintiff's counselor's progress notes demonstrate that Plaintiff acknowledged the minor behavioral issues and that the situation had improved with the similarly minor corrective actions implemented by Gullickson. Second Vickers Decl. Ex. 5. These progress notes are dated March 7, 2017 and March 21, 2017. *Id.* Gullickson also emailed Kelsey to confer about Plaintiff's behavioral issues, first on February 22, 2017, and again on March 22, 2017. Kelsey Decl. Exs. 1, 2. These minor behavioral issues were also documented by Plaintiff's fourth grade teacher, Megan Pena, and were remediated by correctives similar to those used by Gullickson, such as having Plaintiff sit near the teacher. Second Vickers Decl. Ex. 4, at 4.

The school assignment in which Plaintiff revealed that they wanted to be a boy is dated March 24, 2017. L.O.K. Decl. Ex. 1. The spring parent-teacher conference likewise occurred only after Plaintiff's behavioral issues had manifested. Kelsey Decl. ¶¶ 7-10. Even accepting Plaintiff's version of events, the behavioral issues reported by Gullickson, and which Plaintiff themselves acknowledged, occurred substantially

before Gullickson learned Plaintiff was genderfluid or non-binary.  In addition, the behavioral issues continued after Gullickson was no longer Plaintiff's teacher and were remedied by similar corrective action from Plaintiff's fourth grade teacher.  On this record, the Court concludes that Gullickson's report of behavioral issues from Plaintiff and his imposition of disciplinary measures cannot sustain a claim for violation of Plaintiff's equal protection rights.

With respect to the robotics team, Defendants have presented evidence that Gullickson required interested students to submit an application to join the team.  It is undisputed that Plaintiff did not apply to join the team.  Plaintiff acknowledged that they were aware of the robotics team from announcements made during school assemblies, Second Vickers Decl. Ex. 2, at 2, and further acknowledged that they were not aware of any student who was refused an application if they requested one.  *Id.* at 3.  On this record, the Court cannot conclude that Gullickson violated Plaintiff's equal protection rights by excluding them from the robotics team.  Rather, the record shows that Plaintiff was subject to the same application requirement as every other student at Oak Grove.  To the extent that parents of other students may have expressed hostility to Plaintiff joining the team, the evidence is that decisions concerning membership on the team were reserved to Gullickson and he did not consult with the parents of the team members when making decisions on membership.

There is no evidence that Gullickson subjected Plaintiff to differing treatment based on Plaintiff's gender expression or non-binary status.  The Court therefore

concludes that Gullickson is entitled to summary judgment as to Plaintiff's equal protection claim and the Court need not reach the question of qualified immunity.

### B. Matuszak

Plaintiff asserts that Matuszak violated Plaintiff's right to equal protection by failing to enforce bullying policies and making it impossible for Plaintiff to use their preferred pronouns and that by doing so Matuszak denied Plaintiff the ability to safely attend Oak Grove.

"To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional." *Flores*, 324 F.3d at 1134.

In *Flores*, the plaintiffs were a group of high school students who either were, or were perceived to be, LGBTQ. *Flores*, 324 F.3d at 1132. The *Flores* plaintiffs experienced severe bullying by their peers, including menacing notes and pornography left in their lockers, verbal abuse, and even physical violence on account of being (or being perceived as) LGBTQ. *Id.* at 1132-33. The *Flores* plaintiffs reported the incidents to the school principal and to other school authority figures but were met with indifference and inaction at best or, at worst, with statements appearing to sympathize with the plaintiffs' tormentors. *Id.* The *Flores* plaintiffs sued, alleging that the defendants' failure to enforce the school district's established disciplinary, anti-bullying, and anti-harassment policies violated the plaintiffs' right to equal protection. *Id.* at 1135.

In *Flores*, the Ninth Circuit founds that there was sufficient evidence to establish differential treatment and to establish that the defendants had acted with deliberate indifference. *Flores*, 324 F.3d at 1135. "To survive summary judgment on the issue of motive, the plaintiff must put forward specific nonconclusory factual allegations that establish improper motive," including deliberate indifference. *Id.* (internal quotation marks and citations omitted). "Deliberate indifference is found if the school administrator responds to known peer harassment in a manner that is clearly unreasonable." *Id.* (internal quotation marks and citations omitted, alterations normalized). In the case of the *Flores* defendants, the Ninth Circuit found sufficient evidence of deliberate indifference in the defendants' failures to follow up or investigate incidents of violence; in their failure to take further action when the administrator knew that the already-implemented remedial measures were inadequate; in their failure "to take steps to investigate and stop the harassment,"; and in their failure to adequately communicate the district's anti-harassment policies to students "despite defendants' awareness of hostility toward homosexual students at the schools, and in some cases despite plaintiffs' requests to do so." *Id.* at 1135-36.

In addition to finding that the plaintiffs had established a violation of their equal protection rights, the Ninth Circuit also found that the defendants were not entitled to qualified immunity, holding that "[t]he guarantee of equal protection . . .does not itself prescribe specific duties," but instead "requires the defendants to enforce District policies in cases of peer harassment of homosexual and bisexual students in the same way that they enforce those policies in cases of peer harassment

of heterosexual students." *Flores*, 324 F.3d at 1137.  Because the defendants had "discriminated in the enforcement of school policies that required investigations and remedy of student harassment," or had taken "no more than the minimal amount of action in response to the complaints of harassment," the Ninth Circuit found that qualified immunity was not warranted. *Id.* at 1137-38.

In this case, the District has policies providing that "harassment, intimidation, bullying, [and] menacing" are "strictly prohibited" and the school principal and the district superintendent "are responsible for ensuring that this policy is implemented." Mitchell Decl. Ex. 8, at 1.  The policy provides a detailed definition of harassment, intimidating and bullying and provides that protected classes include "gender identity." *Id.* at 2.  School principals are to "take reports and conduct a prompt investigation" of any reported acts act of harassment, intimidation, bullying, or menacing. *Id.* at 3.  The person who makes the report is to be notified when the investigation is complete and is to be told "as appropriate, the findings of the investigations and any remedial action that has been taken in the initial investigation." *Id.*  The District has similar procedures for reporting sexual harassment, Mitchell Decl. Ex. 9, and for preventing discrimination, Mitchell Decl. Ex. 10.

In her deposition, Matuszak acknowledged that she was responsible for investigating complaints and imposing disciplinary measures at Oak Grove, as well as for ensuring that District policies were followed.  Mitchell Decl. Ex. 15, at 6-7. Matszak also acknowledged that District policies "strictly prohibited" harassment,

intimation, and bullying. *Id.* at 9. As principal, Matuszak would respond to reports of harassment or bullying by investigating, speaking with the persons involved and/or with witnesses, and then "making a determination of consequences, if there were any." *Id.* at 12-13. In aid of this responsibility, Matuszak kept a spreadsheet listing students she spoke to concerning disciplinary issues. *Id.* at 15-16. Matuszak would also record incidents in the SWIS system, which tracked behavioral issues for the District, including incidents that fell below the threshold of policy violations. *Id.* at 17-18.

In Matuszak's disciplinary spreadsheet for 2018-19, there are eight entries noted as occurring in September and October of 2018 and the spreadsheet indicates that none of the incidents were recorded in the SWIS system. Mitchell Decl. Ex. 4. Most of the entries reflect minor disciplinary issues, such as rudeness or being disruptive in class and document similarly minor corrective actions, such a loss of recess or being required to work in the hall. *Id.* Only two of the entries indicate that the offending student's parents were contacted. *Id.*

Matuszak testified that, during her tenure as principal of Oak Grove, she did not receive any reports of discrimination based on sex, gender identity, or sexual orientation. Mitchell Decl. Ex. 15, at 21. Matuszak was not aware of any students who identified as non-binary or genderfluid prior to Plaintiff. *Id.* at 23.

Plaintiff's mother received emails from the parents of Plaintiff's classmates expressing hostility to Plaintiff's gender identity, but Matuszak testified that she did not see those emails. Mitchell Decl. Ex. 15, at 28. Matuszak testified that, if she had

seen the email, she would have understood it to be a communication from one parent to another and not a cause for concern. *Id.* at 30-31. Matuszak also testified that, had the communication been directed to Plaintiff, rather than to their mother, it would not have violated the District's anti-bullying policy because "it didn't feel menacing or intimidating." *Id.* at 31. Matuszak was not aware whether the anti-bullying policy applied to parents who led activities at the school. *Id.* at 33.

Matuszak did not learn about the incident concerning attire for Plaintiff's fourth grade field trip until Plaintiff was in the fifth grade and expressed the view that the matter was a miscommunication. Mitchell Decl. Ex. 15, at 36-37. Matuszak felt that, had the teachers insisted on Plaintiff wearing women's clothing for the trip, it "wouldn't have been appropriate," but that she did not believe it would have been a policy violation. *Id.* at 38.

Matuszak testified that Kelsey did not specifically raise the possibility that Gullickson had excluded Plaintiff from the robotics team over Plaintiff's gender identity. Mitchell Decl. Ex. 15, at 41-42. In another email exchange, Kelsey reported to Matuszak that the parents of other children on the robotics team wanted to exclude Plaintiff based on Plaintiff's gender expression, but Matuszak did not respond or investigate. *Id.* at 46. Matuszak believed that the report reflected only Plaintiff's perception that they had been excluded based on gender expression and did not investigate to determine if that opinion was founded. *Id.* at 47-48.

When Kelsey reported to Matuszak that Plaintiff was being bullied by other students, Matuszak learned the name of a student who was reported as engaging in

the bullying and "had a discussion with them about it." Mitchell Decl. Ex. 15, at 54. The student admitted to calling Plaintiff names and teasing them. *Id.* at 55. Matuszak did not recall if the teasing had been related to Plaintiff's gender expression but acknowledged that it might have been. *Id.* Matuszak told the student that their behavior was inappropriate and the student said that they would stop. *Id.* That was the end of Matuszak's inquiry into the matter. *Id.* at 56.

Matuszak testified that she received an email from Kelsey reporting that another student had threatened to remove Plaintiff's clothing in order to see their genitals. Mitchell Decl. Ex. 15, at 57. Matuszak did not recall how she responded to the report and did not recall if she investigated the report. *Id.* at 58. When asked if that reported conduct would be a violation of the District's anti-bullying policy, Matuszak responded that she did not know. *Id.*

Plaintiff's teacher, Riley, also asked Matuszak about what guidance was available for teachers if they observed parents or community members objecting to a student's clothes or gender expression or if children were bullying a student over the same. Mitchell Decl. Ex. 15, at 59. Matuszak did not respond to Riley's inquiry. *Id.*

Kelsey also emailed Matuszak to report that Plaintiff was finding derogatory internet articles placed in their backpack. Mitchell Decl. Ex. 15, at 60. These articles were printed from "fringe websites" and contained "derogatory remarks about gender non-conforming students and [an] exhortation to harass them." *Id.* Matuszak offered to follow up with Plaintiff's teachers. *Id.* at 61-62. Matuszak did not consider the articles found in Plaintiff's backpack to be a form of bullying. *Id.* at 62. Matuszak

asked Plaintiff's teachers if they were the source of the articles, which the teachers denied, but Matuszak did not speak with Plaintiff directly about the articles, nor did she ask them if this was the first time they had found such materials in their bag. *Id.* at 64.

Matuszak observed signs that Plaintiff was having a difficult time in fifth grade and supported Plaintiff's transfer to Albany Online. Mitchell Decl. Ex. 15, at 65-66. Once Plaintiff left Oak Grove, Matuszak made no further inquiries into the reports of bullying and harassment experienced by Plaintiff. *Id.* at 66.

The lack of investigation into the most concerning reports of bullying and harassment of Plaintiff by their classmates weighs strongly against granting summary judgment in favor of Matuszak on Plaintiff's equal protection claim, especially when the lack of action or investigation is weighed against investigations undertaken for much less serious behavioral incidents reflected in Matuszak's disciplinary spreadsheet. A reasonable jury could conclude that Matuszak did not investigate Plaintiff's reports in the way she might have investigated the reports of gender-conforming student and that Matuszak's failure to investigate or remediate the reports of peer harassment, including the placement of abusive materials in Plaintiff's backpack, or the threat of removing Plaintiff's clothes, amounted to deliberate indifference.

Given the striking similarities between some of the reports of abuse in this case and those reported in *Flores*, including the placement of abusive articles in Plaintiff's bag and the overt threats against their safety, and the similarly minimal

response to those reports by the principal, the Court concludes that the right in question was clearly established at the time of the events giving rise to this case. As with the school administrators in *Flores*, the Court concludes that Matuszak is not entitled to the benefit of qualified immunity. The Court therefore denies Defendants' motion as to Plaintiff's claim for violation of their equal protection rights against Matuszak.

### C. The District

In general, liability under § 1983 attaches to individual people, but the Supreme Court has held that local governmental entities—in this case the District—may be sued under § 1983 if the constitutional violation arises from "execution of a government's policy or custom." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish *Monell* liability, a plaintiff must show a constitutional violation caused by (1) an employee acting under an expressly adopted official policy; (2) an employee acting under a longstanding practice or custom that amounts to an official policy; or (3) an employee acting as a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

In this case, Plaintiff alleges that the District "maintained a policy, practice or custom of failing to protect gender-nonconforming students from bullying and harassment and failing to provide such students with an environment that allows them to safely participate in school." FAC ¶ 44. Plaintiff alleges that these policies, practices, or customs include "condoning teachers who were unwilling or unable to teach L.O.K. because of their gender identity; knowingly allowing and encouraging

mis-gendering of students; failing and refusing to respond to known harassment on the basis of gender identity; and failing to educate or train teachers and staff about gender identity and non-discrimination on the basis of gender identity." *Id.*[2]

The parties agree that no such official policy exists, but express adoption is not required for *Monell* liability. "It is sufficient that the constitutional violation occurred pursuant to a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

*Monell* liability can also arise from a failure to train, supervise, or discipline that amounts to an official policy of deliberate indifference to an individual's constitutional rights. *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019). A school district may be liable on a failure to train or supervise theory when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). To demonstrate a municipality's deliberate indifference to its

---

[2] Plaintiff alleges that Matuszak was the "final policymaker" for the District with respect to Plaintiff's *Monell* claim. FAC ¶ 45. In Oregon, however, the statutory structure of public school system is such that "the school board, not the superintendent or school principal, is the final policymaker." *G.C. ex rel. Counts v. N. Clackamas Sch. Dist.*, 654 F. Supp.2d 1226, 1250 (D. Or. 2009). To the extent that Plaintiff's claim rests on Matuszak being the final policymaker for the District, the claim fails.

inadequate training program, the plaintiff usually must show a pattern of similar constitutional violations caused by inadequate training. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

In this case, Plaintiff asserts that a jury could conclude that the District had a custom of ignoring reports of harassment and discrimination against LGBTQ students based on Matuszak's failure to investigate or remediate Plaintiff's own reports for an extended period of time. In support of this claim, Plaintiffs have submitted the results of Oregon Student Wellness Surveys done by the Oregon Health Authority in Linn County between 2010 and 2018. Mitchell Decl. Ex. 19. According to the 2016 survey, 13.2% of sixth grade students in Linn County reported being harassed in the past 30 days because someone believed them to be LGBTQ. *Id.* at 15. The number rose to 20.3% in 2018, although the Court notes that the numbers were 22.5% for 2010, 19.6% for 2012, and 15.1% for 2014. *Id.* at 3, 7, 11, 19. Although these numbers are concerning, they do not provide direct evidence of a policy or custom inaction on the part of the District and would rather seem to reflect general long term downward trend that suddenly reversed itself between 2016 and 2018.

In response to Plaintiff's request for production seeking documents relating to complaints of bullying, discrimination, or harassment directed at students based on the student being LGBTQ, or on the basis of sex, sexual orientation, or gender identity between 2015 and the present, the District responded that it had no such reports, other than those related to Plaintiff. Mitchell Decl. Ex. 6, at 7.

Even accepting these two facts as true—that a substantial percentage of students in the District reported being harassed and bullied for being LGBTQ and that no formal complaints have been made—Plaintiff has not made a sufficient showing of a longstanding practice or custom by the District of ignoring the safety of gender-nonconforming students. There might be any number of reasons why students would not initiate formal complaints concerning bullying that is not witnessed by District staff and the Court cannot extrapolate the existence a longstanding custom or unwritten policy from the results of the surveys weighed against the lack of formal complaints. Nor has Plaintiff established, on this record, that the need for training for District staff in the areas of gender identity was so obvious and so likely to result in a constitutional violation that it amounted to deliberate indifference, particularly given the high standard that such claims must clear. The Court therefore grants Defendants' motion with respect to Plaintiff's *Monell* claim against the County.

## III.    Title IX

Plaintiff brings an additional federal claim under Title IX of the Education Amendments of 1972 alleging that the District's "failures to address known harassment and discrimination were clearly unreasonable in light of the known circumstances and were deliberately indifferent." FAC ¶ 50.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20

U.S.C. § 1681(a). The Fourth Circuit has held that this prohibition of discrimination extends to situations where "the discriminator is necessarily referring to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020).

Here, Plaintiff asserts that they experienced a Title IX violation based on Gullickson's actions in excluding them from the robotics team and when the Plaintiff was subjected to egregious harassment by their peers. For the reasons discussed in the previous section, however, the Court concludes that there is no evidence that Gullickson excluded Plaintiff from the robotics team on the basis of Plaintiff's gender presentation. As discussed, Plaintiff never applied to join the team and such an application was a precondition to consideration for membership. The Court therefore grants Defendants' motion as to the allegations against Gullickson and turns to consideration of harassment by Plaintiff's classmates.

In order for a school district to be liable for peer-on-peer harassment under Title IX, a plaintiff must establish four elements: (1) the school must exercise "substantial control over both the harasser and the context in which the known harassment occurs,"; (2) the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school,"; (3) the school must have had "actual knowledge" of the harassment; and (4) "the school district is liable

only if its 'deliberate indifference subjects its students to harassment.'" *Counts*, 654

F. Supp.2d at 1237 (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)).

Here, there can be no reasonable dispute that the District exercised substantial control over both Plaintiff and their classmates and so the first element is satisfied.

With respect to the second element, the Supreme Court has cautioned that courts must bear in mind that children are not adults and are, to some degree, expected to behave in ways that would not be acceptable among adults. *Davis*, 526 U.S. at 651. "Damages are not available for simple acts of teasing and name-calling among school children . . . even where these comments target differences in gender." *Id.* at 652. In this case, the incidents include name calling and cruel remarks, but also threats of removing Plaintiff's clothing and the placement of abusive literature in Plaintiff's bag. This pattern of abuse was consistent and severe enough that Plaintiff began to suffer psychologically to the point where signs of their distress were apparent to Matuszak. Mitchell Decl. Ex. 15, at 65. On this record, the Court concludes that a reasonable jury could find that the bullying and abuse Plaintiff experienced was severe, pervasive, and objectively offensive.

Matuszak acknowledged in her deposition that she received emails from Plaintiff's mother concerning many of the incidents. *See, e.g.,* Mitchell Decl. Ex. 15, at 57, 60. A reasonable jury could conclude that the District had actual knowledge of the peer harassment Plaintiff was experiencing.

School administrators enjoy considerable flexibility in responding to incidents of peer harassment, provided they are not deliberately indifferent, meaning "the

recipient's response to harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Schools are not required to "take heroic measures, to perform flawless investigations, to craft perfect solutions, or adopt strategies advocated by parents," and "a claim that the school system could or should have done more is insufficient to establish deliberate indifference." *Counts*, 654 F. Supp.2d at 1241 (internal quotation marks and citation omitted). In this case, as discussed in the previous section, the school either did not investigate reports of harassment submitted by Plaintiff's mother, or performed only minimal investigations, such as asking the teachers if they were the source of the abusive literature that appeared in Plaintiff's bag. A reasonable jury could find such a reaction to be clearly unreasonable and the Court therefore declines to grant summary judgment in favor of the District as to this claim.

As a final matter, however, the Defendants seek to dismiss Plaintiff's claim for punitive damages under Title IX. Punitive damages are not available for claims brought under Title IX. *Wilson v. Southern Or. Univ.*, No. CV 06-3016-CO, 2006 WL 2668468, at *1 (D. Or. Sept. 15, 2006); *Thomsen v. City Coll. of San Francisco*, No. C 08-3333-SBA, 2008 WL 5000221, at *5 (N.D. Cal. 2008) (citing *Barnes v. Gorman*, 536 U.S. 181, 188 (2002)). The Court therefore grants Defendants' motion on the limited issue of the availability of punitive damages for claims brought under Title IX.

## IV.    ORS 659.850

Oregon law prohibits discrimination in public schools. ORS 659.850(2). Discrimination "means any act that unreasonably differentiates treatment, intended

or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on race, color, religion, sex, sexual orientation, gender identity, national origin, marital status, age or disability." ORS 659.850(1)(a)(A). Gender identity "means an individual's gender-related identity, appearance, expression or behavior, regardless of whether the identity, appearance, expression or behavior differs from that associated with the gender assigned to the individual at birth." ORS 174.100(4). The prohibition extends to both disparate treatment discrimination, "*i.e.*, a policy or practice that affirmatively treats some persons less favorably than other based on certain protected criteria," and to disparate impact discrimination, "*i.e.*, a facially neutral policy that adversely affects a group that shares certain protected characteristics, such as race, sex, or religion." *Nakashima v. Or. State. Bd. of Educ.*, 344 Or. 497, 509 (2008).

In this case, Plaintiff alleges that the District "discriminated against L.O.K. in violation of ORS 659.850 by subjecting them to unreasonable differential treatment on the basis of sex and sexual orientation." FAC ¶ 59. The parties provide scant briefing on this issue, but Plaintiff argues that "as in the Equal Protection and Title IX contexts, a jury could conclude that [the District] subjected [Plaintiff] to unreasonable differential treatment by penalizing [Plaintiff] for being nonbinary in numerous ways over a period of two and a half years, which deprived [Plaintiff] of their ability to participate in their education." Pl. Resp. 32 (quotation marks omitted and alterations normalized).

For the reasons set forth in the previous sections, therefore, the Court concludes that this claim survives as to Plaintiff's allegations concerning the District's failure to investigate or remediate Plaintiff's reports of abuse and harassment, but that this claim is otherwise dismissed.

## V.    Plaintiff's Motion to Unseal

Defendants have filed their Motion for Summary Judgment, Reply brief, and supporting exhibits under seal "in an abundance of caution because this matter involves confidential information relating to [Plaintiff] and other minor students." Def. Resp. ECF No. 42.    Plaintiff moves to unseal Defendants' Motion and all supporting exhibits except for Vickers Decl. Ex. 1, ECF No. 29-1; to unseal Defendants' Reply brief, ECF No. 39, and its supporting exhibits; and to unseal Mitchell Decl. Ex. 7, ECF No. 37-7.  Defendants do not oppose unsealing Plaintiff's exhibit and leave the question of unsealing the other materials to the Court's discretion.  Defendants request that, if the Court orders the documents unsealed, that Defendants be ordered to re-file redacted versions of the exhibits to remove all references to minor students' names in the exhibit consistent with Federal Rule of Civil Procedure 5.2.  The Court concludes that Defendants' proposal is a reasonable one.  The Court will order that the Motion and Reply be unsealed and Defendants are ordered to resubmit the supporting exhibits with the names of any minors redacted.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF No. 28, is GRANTED in part and DENIED in part.  Plaintiff's claim under ORS

659.852 and Plaintiff's claim for retaliation under Title IX, as well as Plaintiff's claim for punitive damages under ORS 659.850 are conceded and so DISMISSED. Plaintiff's claims against the District and Defendant Gullickson for violation of Plaintiff's equal protection rights are DISMISSED.  Plaintiff's claim for punitive damages under Title IX is DISMISSED.  Defendants' motion is otherwise DENIED as set forth above.

Plaintiff's Motion to Unseal a Document, ECF No. 41, is GRANTED and Defendants' Motion, ECF No. 28, and Reply, ECF No. 39 shall be unsealed. Defendants are directed to submit redacted versions of their supporting exhibits, ECF Nos. 29, 40, with appropriate redactions to obscure the names of minors.

It is so ORDERED and DATED this ____28th____ day of June 2022.


 /s/Ann Aiken_____
ANN AIKEN
United States District Judge